AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**12/1/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**Dec 01 2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ib _____ DEPUTY

United States of America

v.

SAED ISMAIL AMIRI,

Defendant

Case No.     2:20-mj-05837-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of February 28, 2016, through March 1, 2016, in the County of Los Angeles in the Central

District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
Michael Foster
*Complainant's signature*

Michael Foster, Special Agent
Special Inspector General for Afghanistan
Reconstruction
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        12/1/2020

_____
*Judge's signature*

Hon. Alexander F. MacKinnon,
U.S. Magistrate Judge
_____
*Printed name and title*

City and state:   Los Angeles, California

**AFFIDAVIT**

I, Michael S. Foster, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    Since 2011, I have been a Special Agent with the Special Inspector General for Afghanistan Reconstruction ("SIGAR").  As a Special Agent at SIGAR, I specialize in investigating criminal violations of the United States Code, including government fraud and corruption matters related to U.S. funding in Afghanistan.  Prior to joining SIGAR, I was a Special Agent with the Federal Bureau of Investigation ("FBI") for over 25 years, where I investigated white collar fraud and corruption, including government contract fraud and related corruption matters.  At both SIGAR and the FBI, I have also supervised agents who investigated fraud and corruption matters.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, SAED ISMAIL AMIRI, also known as "Adnan Herat" ("AMIRI"), for a violation of 18 U.S.C. §§ 1349, 1343 (Conspiracy to Commit Wire Fraud).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

4.    AMIRI conspired with others in executing a scheme to defraud the American and Afghan governments in relation to an electric grid construction contract in Afghanistan that was worth over $100 million.  As described below, AMIRI and his co-conspirators agreed to create, and created, fake and forged documents and shell companies, in order to deceive the American and Afghan governments into believing that AMIRI's company had relevant experience in building electric grids in Africa when, in truth and in fact, it had no such experience.  The scheme was unsuccessful in that evidence of the crime was discovered before AMIRI's company could obtain the contract.  AMIRI thereafter lied to U.S. law enforcement agents to conceal the conspiracy. Over four years after the scheme was executed, AMIRI admitted to U.S. law enforcement agents that he created and submitted the fake and forged documents.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

5.    Based on witness interviews I have conducted, including of AMIRI; my review of documents obtained from third parties, including emails from accounts associated with AMIRI and his co-conspirators obtained by federal search warrants; my review of reports of interviews conducted by other law enforcement officers; conversations I have had with other law enforcement officers; my review of publicly filed documents; and my training and experience, I know the following:

2

**A.    Relevant Individuals and Entities**

6.    The United States Agency for International Development ("USAID") is a U.S. government agency funded by U.S. tax dollars and headquartered in Washington, D.C.  As stated on its website, USAID leads international development and humanitarian efforts to save lives, reduce poverty, strengthen democratic governance, and help people progress beyond assistance.

7.    The national power utility of Afghanistan, known as Da' Afghanistan Breshna Sherkat ("DABS"), is an independent company owned by the Afghan government.  DABS operates and manages electric power generation throughout Afghanistan.  In connection with the U.S. War in Afghanistan and ongoing U.S. efforts to reconstruct Afghanistan and assist the Afghan people, USAID has provided DABS with financial assistance to fund projects in order to enable Afghanistan to expand its electric grid.

8.    AMIRI is a lawful permanent resident in the United States whose primary residence is in Irvine, California, which is in the Central District of California.

9.    According to contract bid documents obtained from DABS and USAID, AMIRI was the primary owner of Assist Consultants Incorporated ("ACI").  According to U.S. government contract records, ACI has received approximately $263,199,360.55 in U.S. funded contracts since 2013.

**B.    ACI Submits a $112,292,241.05 Bid on a Contract Funded by USAID**

10.   In or around January 2015, USAID authorized DABS to solicit bids to connect Afghanistan's Northeastern and Southeastern electric grid systems (the "NEPS/SEPS Contract"). This contract was to be funded by U.S. taxpayers through USAID.

11.   In or around February 2015, according to records obtained from DABS, DABS issued a Letter of Invitation in which it stated that it had received USAID funding toward the cost of the NEPS/SEPS Contract, and in which it solicited competitive bids on the NEPS/SEPS Contract.

12.   On or about February 21, 2015, co-conspirator 1 ("CC-1"), an ACI employee, told AMIRI in an email that he had "[p]repared the checklist for DABS (USAID-funded) NEPS/SEPS substation project and transmission line project."

13.   In or around April 2015, according to bid documents that ACI submitted to DABS, ACI entered into a joint venture agreement with another company to bid on the NEPS/SEPS Contract. The agreement stated that AMIRI was a Principal and Interim Decision Maker.

14.   On or about April 14, 2015, CC-1 emailed AMIRI and stated that he was, "Reviewing the requirements of NEPS/SEPS substation proposal. Working on preparing proposal structure and preparing some proposal forms."  The next day, CC-1 emailed AMIRI and indicated he was preparing "experience forms" for the NEPS/SEPS Contract.

4

15.   In or around May 2015, according to bid documents that ACI submitted to DABS, AMIRI filed a general Power of Attorney with DABS, which authorized co-conspirator 2 ("CC-2"), an ACI employee, to sign on behalf of ACI for all acts relating to the NEPS/SEPS Contract.

16.   On or about May 2, 2015, co-conspirator 3 ("CC-3"), an ACI employee, sent an email to CC-1 in which he copied AMIRI and stated, "I will start preparing things which have been mentioned," including a "Stamp for Alktra" and "Preparation of Certificates."   The next day, CC-3 sent CC-1 an email stating, "Stamps will be ready tomorrow."   CC-3 attached to the email a backdated 2011 certificate of appreciation, which was prepared for the "Design, Supply, Erection, Construction, Testing and Commissioning of 220/22 kV Suruma Cement Factory Substation at Kampala Industrial Site, Uganda."   The certificate contained a logo for Electra Professional Solutions ("EPS"), which, as described below, see infra ¶¶ 19-24, was a fictitious company that ACI invented and controlled.[1]

17.   According to documents obtained from DABS and USAID, in or around July 2015, CC-2 attended a DABS meeting at which ACI's joint venture submitted the lowest bid on the NEPS/SEPS Contract for $112,292,241.05.   ACI underbid the other bidders by over $20 million.

18.   In its bid, ACI attached documents listing AMIRI as President and a 99% owner.

---

[1] The emails described in this paragraph were in the language Dari and were translated into English.

5

19. In a section detailing its experience, ACI stated that it worked as a subcontractor to EPS. ACI falsely claimed it worked on the design of a "220/22 kV" substation as a "distribution node in Kampala Industrial Site's power grid for the Suruma Cement Factory, Kampala Industrial Site, Uganda," as well as a "220/22 kV Substation for the Ekekwe Textile company, Lagos, Nigeria." As further described below, see infra ¶ 44, DABS and USAID subsequently investigated the Ugandan claim and determined that ACI's representation was false by contacting Ugandan government authorities, who confirmed that ACI, in fact, had not worked on a "220/20 kV" substation in Uganda.

20. ACI's false representations that it worked on two 220 kilovolt substations for the Suruma Cement Factory ("Suruma"), and Ekekwe Textile Company ("Ekekwe"), were material to decisions relating to whether ACI or its competitors would be awarded the NEPS/SEPS Contract. The contract criteria specifically required ACI to have worked on two substations of 220 kilovolts or more and to have substantiated such work with certificates, which ACI included within its bid.

**C.     AMIRI and His Co-Conspirators Continue to Deceive DABS and USAID After ACI Is Confronted About its Claimed Experience with Electric Grids in Africa**

21. In or around December 2015, DABS and USAID began seeking corroboration of ACI's claimed work experience with electric grids in Africa. According to emails obtained from a search warrant on email accounts related to ACI, DABS emailed EPS' email account, which ACI had listed in its bid, and which ACI controlled at all relevant times (info@eps-inc.net). In the

6

email, DABS sent a letter asking EPS to confirm whether ACI had in fact worked on the African grids.  A few days later, CC-1, who controlled the EPS email account, emailed AMIRI and asked how to respond.  AMIRI replied, "Wait."  One week later, ACI, under the guise of EPS, emailed DABS a letter falsely stating ACI executed the projects, signed by the alleged Chief Executive Officer of EPS.

22.  On or about February 5, 2016, DABS requested via email that EPS provide email addresses for Suruma and Ekekwe.  CC-1 sent the email to AMIRI and noted that Suruma and Ekekwe, in addition to email addresses, also needed an address, phone number, and a person to answer calls.  AMIRI replied to CC-1's email by asking, "Is there any cement factory in Uganda?," "Is there any company in the world by the name of Suruma Cement Factory?," and "How long it will take to open a company in Uganda?"  AMIRI also asked, "[B]uy a dom[a]in for Suruma Cement factory as soon as possible?," and "How long can we activ[ate] this website, we will need two team to work on it?"  CC-1 responded by stating that Suruma and Ekekwe did not exist, to which AMIRI replied, "Ok, we will start registration soon but we need to start the websites right[] away[.]"

23.  On or about February 14, 2016, CC-1 sent an email to AMIRI stating that the Suruma and Ekekwe email accounts had been activated.  In the email, CC-1 also included a draft response to DABS listing points of contact for Suruma and Ekekwe, which CC-1 asked AMIRI to review.  Thereafter, ACI, under the guise of EPS, emailed DABS the email addresses for contacts at Suruma and

7

Ekekwe, which contained fraudulently created domain names (surumacement.com and ekekwetextile.com).  As described below, see infra ¶¶ 43, 49, these points of contact included co-conspirator 4 ("CC-4"), a business affiliate of ACI residing in Uganda, as well as his associates such as his girlfriend, and they were selected to conceal the fraud in the event that DABS or USAID sought to verify ACI's claimed experience with grids in Africa.

24.  Also on or about February 14, 2016, DABS asked EPS for certificates of completion from Suruma and Ekekwe.  CC-1 stated in an email to AMIRI and his co-conspirators, "We might need stamps?," to which AMIRI replied that CC-1 should ask AMIRI's secretary to "make the stamps."  CC-1 thereafter sent AMIRI the draft certificates, to which AMIRI replied, "Confirm Please submit."  Thereafter, CC-1, through the EPS email account that ACI controlled, sent DABS the certificates along with a letter from Suruma that had ostensibly been sent to EPS.  The letter stated EPS completed the "Contract#SU-CNU-100103 Design, Supply, Construction, Testing and Commissioning of 220/22 kV Suruma Cement Factory near Kampala, Uganda," and also expressed appreciation to EPS' "key" subcontractor, ACI, who should be "proud" of its work.  Moreover, the letter was signed by an alleged Vice President for Suruma, who CC-4 identified during an interview as his attorney in Africa, and who ACI falsely presented to DABS as a contact for Suruma, see supra ¶ 23; infra ¶ 49.

**D.    AMIRI Continues to Conspire to Execute a Scheme to Deceive and Defraud DABS and USAID While AMIRI Is in the Central District of California**

25.    On or about February 18, 2016, flight records show that AMIRI boarded a flight from Doha International Airport to Los Angeles International Airport ("LAX").  During the following weeks, AMIRI, from the Central District of California, continued to engineer the scheme to deceive and defraud DABS and USAID.

26.    On or about February 28, 2016, CC-2 sent the co-conspirators and AMIRI an email titled "Very Urgent" stating, "We have to find a GOOD and TRUSTABLE buddy in Uganda Electricity Transmission Company Ltd."  CC-2 then addressed CC-4 and stated, "[P]lease make it happen. Also, please send us your working number since Mr. Amiri wants to talk to you."  Later that day, CC-4 replied to the co-conspirators and AMIRI, "I will see what I can do, I will have to reach out to my contacts at UMEME [Ugandan Ministry of Energy and Mineral Development] who is in charge of the end user distribution. My working number in Niger is below."  As described more below based on detail contained in other emails between AMIRI and his co-conspirators, see infra ¶¶ 28-30, the goal of this email chain appears to have been to begin organizing an effort to obtain fraudulent documents in order to support the false statements AMIRI and ACI had made in its bid to DABS and USAID.

27.    On or about February 29, 2016, DABS contacted ACI by sending an email to CC-2 stating there was a contradiction between the voltage capacity in Uganda and the capacity of the substation on which ACI claimed to have worked.  DABS requested

9

that ACI provide by March 2, 2016, contact information for the Uganda Electricity Transmission Company ("UETCL"), which was the national power utility in Uganda; the substation location; pictures; the subcontract; grid connections; payment records; and a letter from the UETCL identifying the owner of Suruma.

28.  AMIRI forwarded this email and stated, "We need to talk," to which CC-1 replied, "I am ready."  CC-1 thereafter sent AMIRI and other co-conspirators an email listing a draft response to DABS, which highlighted different sections to indicate "critical time taking parts."  AMIRI then emailed his co-conspirators, "We need to send [co-conspirator 5 ("CC-5"), an ACI employee] to both Niger and Uganda."  AMIRI then sent another email to his co-conspirators stating, "[co-conspirator 6 ("CC-6"), an ACI employee], you may need to go to Uganda for 2-3 days to train [CC-5] and than [sic] from there go to the US."[2]

29.  On or about March 1, 2016, CC-1 sent an email to AMIRI and the co-conspirators titled "Action Plan from today teleconference."  The email listed steps to prepare false and forged documents related to Suruma and Ekekwe, including sending co-conspirators to Uganda to obtain fake records, as AMIRI had directed the day before, see supra ¶ 28.

30.  Also on or about March 1, 2016, flight records show that AMIRI boarded a flight from LAX to Istanbul Ataturk Airport to travel to Dubai and Afghanistan, where, as described below,

_____

[2] AMIRI sent these emails from California to an email account outside the United States using wires in interstate and foreign commerce.

he would proceed to submit false documents to DABS that he and his co-conspirators created to facilitate the scheme.

**E.   AMIRI Directs the Creation of Business, Financial, and Government Records**

31.   On or about March 2, 2016, the date of the deadline to submit documents to DABS, CC-2 emailed DABS that it would be "impossible" to meet the deadline because it was difficult to communicate with "the user and the prime contractor" (i.e., Suruma and EPS).   In a response email, DABS extended the deadline by two weeks, to March 16, 2016.

32.   That same day, co-conspirator 7 ("CC-7"), a U.S. citizen who was one of AMIRI's business affiliates, sent an email in which he asked CC-1 to send the documents in ACI's bid describing its experience in Uganda and Nigeria so he (CC-7) could "understand the results that are needed."   AMIRI told CC-1 in an email to send CC-7 "the past performance of Uganda and Niger substation."   According to AMIRI's instruction, later that day, CC-1 emailed CC-7 the past performance documents in ACI's bid that falsely described its experience in Africa, which USAID and DABS were questioning.

33.   On or about March 9, 2016, which was one week before the new deadline that DABS gave ACI to submit documents, AMIRI sent an email to some of his co-conspirators.   AMIRI titled the email "Uganda and Nigeria mission" and stated:

> Just to remind you this issue is my top priority, I
> need every one attention, and loyalty for execution of
> subject missions.   The subject Mission is fundamental
> elements for our future relation.   I need to Uganda
> mission to be done by the end of today and tomorrow I
> need you to be in Nigeria.   I am also not happy with

11

current reporting system among us, improve it immediately.

34.   On or about March 13, 2016, AMIRI emailed his co-conspirators and indicated that their efforts over the past 10 days had resulted in ACI obtaining a package of documents that would respond to the concerns DABS and USAID had expressed with ACI's bid.   "Due to efforts of team," AMIRI stated, "30 minutes ago I could get the package for the Uganda project, there are attached to this email."   AMIRI asked "the team" to read it very carefully because "once we will submit the package than [sic] we cannot change anything."   AMIRI thereafter added that they needed to "provide the minimum information for DABS, just a small piece to cover their questions," and further stated this was a "TOP PRIORITY, so please leave everything else alone." Thereafter, CC-1 replied that the documents would prove a "220KV" system in Uganda, but ACI still needed "a letter signed and stamped by UETCL."

35.   On or about March 14, 2016, AMIRI emailed his co-conspirators and asked CC-7 if he could "check to see if our POC can find a connection with UETCL?"   As discussed below, see infra ¶¶ 41-42, ACI submitted a letter to DABS from the Ugandan Ministry of Energy and Mineral Development ("UMEMD"), with whom CC-4 indicated he had contacts, see supra ¶ 26.

36.   That same day, AMIRI sent an email to his co-conspirators in which he indicated that DABS sought payment records for the work ACI had allegedly done for EPS in working on the grid for Suruma.   AMIRI asked, "Can you figure out and

12

suggest any plan to answer to this question?"  CC-5 replied that he spoke to CC-7, who would show a sample record "to our contact in Uganda[.]"  AMIRI replied, "I wish you could do it while you were in Kampala since it was part of your mission and [I] also called and emphasize that to you as well. If you remember I told you to get one statement for both contracts. Anyway, please focus on this issue."

37.  On or about March 15, 2016, co-conspirator 8 ("CC-8"), a bank-teller in Uganda, emailed CC-5 a draft of a bank statement purportedly indicating that EPS had paid ACI for working on the electric grid for Suruma.  CC-5 then sent the example to AMIRI and stated, "The bank letter looks very real and professional but at a price. If this confirmed then I'm going to ask him to create all the payment records like this example with the information that we give him."

38.  That same day, AMIRI asked CC-6 in an email to "put in the Subcontract agreement between ACI and EPS the following points: a- The project tax was the responsibility of EPS b- The progress payment was through paying to Money Exchange Shop."

39.  On or about March 16, 2016, which was ACI's deadline to submit the documents to DABS, CC-1 sent an email to AMIRI and his co-conspirators, which attached a draft of a backdated 2012 subcontract between ACI and EPS on the Ugandan project for Suruma.  Later that day, AMIRI submitted a signed version to DABS, with the rest of the fake records.

13

F.    AMIRI Creates a Fake Email Account Through Which He
      Submits the Fake Package

40.    According to information obtained through a search warrant on the email account that was used by ACI to submit the package of documents that DABS and USAID had requested, on or about March 16, 2016, AMIRI created this email account, which ostensibly appeared to be a generic ACI email account not linked to AMIRI (tender.assist.consultants@gmail.com).

41.    Within an hour of AMIRI's creation of this ACI email account, CC-2 forwarded to this account the email DABS had sent to ACI giving a two-week deadline to submit the documents. AMIRI then responded to this email from DABS, using the new ACI email account he created.  The email included a cover letter stating, "ACI had to make travel arrangements to Uganda, visit the project site and gather up-to-date reference information for the project including reference information from the [Ugandan] Ministry of Energy and Mineral Development."

42.    The email attached a series of documents consisting of coordinates for a Ugandan substation; photographs; bank records; a subcontract showing the substation's capacity at 220 kilovolts; and a forged letter from K.K., the Secretary of UMEMD, which included a fake signature and Ugandan government seal on the letter.  As described below, see infra ¶¶ 44, 48, these documents were false, fraudulent, and forged.

43.    On or about March 20, 2016, CC-7 emailed AMIRI and stated that USAID had called co-conspirator 9 ("CC-9"), a Ugandan citizen who was one of the fake representatives that ACI

14

had previously provided to DABS as a company contact for Suruma (and who was CC-4's girlfriend, see supra ¶ 23; infra ¶ 49). CC-7 stated that he reached out to the fake representatives to ensure that they knew "to validate."  AMIRI replied, "if he was real USAID, he would send email for sure, so let's wait more to see[.]"  CC-7 responded that "obviously this was started by our submission package" and suggested that AMIRI call the USAID number to see who answers, to which AMIRI replied, "Roger that."

44.  According to records provided by DABS and USAID, two weeks later, on or about April 4, 2016, the UMEMD, in response to a letter that USAID sent, replied that the letter from its Secretary, K.K., was a "forgery."  The UMEMD added that the entire package of documents was a "total fabrication" with "falsified information."  Two days later, the UETCL sent DABS a reply in which it stated that Uganda does not have any "220/22kv substations" and that the maximum voltage capacity in Uganda is 132kv.  Moreover, the UETCL added that it "never at any time engaged EPS" who was "unknown" and whose claims "to have constructed [a] 220/22kV substation in Uganda are false."

**G.    AMIRI Makes False Statements to U.S. Law Enforcement Agents After Which He Admits to Engaging in the Scheme**

45.  On or about April 20, 2016, U.S. law enforcement agents interviewed AMIRI at the U.S. Embassy in Kabul.  During the interview, AMIRI stated that he began to lose interest in ACI, and in May 2015, he gave the company to his father.  AMIRI further stated that he learned from his father the prior month, in March 2016, that the ACI joint venture had bid on the DABS

15

project.  This statement is contradicted by evidence showing that AMIRI, in February 2015, when DABS issued a Letter of Invitation on the NEPS/SEPS Contract, knew about and was involved in the preparation of ACI's false claims in its bid, see supra ¶¶ 12-18.  This statement is also contradicted by evidence showing that AMIRI, in December 2015 and February 2016, directed ACI employees to create false records to corroborate the false claims in ACI's bid, during ACI's conspiracy to deceive and defraud DABS and USAID, see supra ¶¶ 21-28.

46.  On or about April 24, 2016, DABS contacted ACI by emailing CC-2 and asking if ACI would extend the expiration date of its bid while the evaluation of it continued.  Six days later, the date that ACI's bid was set to expire, AMIRI replied to DABS by withdrawing ACI's bid.

47.  On or about October 21, 2019, U.S. law enforcement agents interviewed AMIRI.  During the interview, AMIRI stated, among other things, that an ex-employee of ACI was the person who had been involved in submitting fraudulent documents to DABS related to an ACI bid.  He also noted that in his position at ACI, he was extremely busy and "could not read every e-mail."

48.  After further investigation, including a search warrant on multiple email accounts related to AMIRI and ACI, which contained the emails that have been described above (with the exception of the email described in ¶ 33, which was obtained from CC-4), agents interviewed AMIRI again on or about July 21, 2020 in the Central District of California.  AMIRI indicated he created the package of documents and submitted them to DABS

16

because, when ACI was questioned, it was a "matter of protection" in order to "make the problem go away."

49.  One month later, on or about August 21, 2020, CC-4 was interviewed by agents.  CC-4 stated that he lived in Uganda in 2016.  CC-4 further stated that AMIRI and some of his co-conspirators asked for a contact regarding past performance in Uganda on ACI's electric work.  CC-4 stated he knew ACI had not done work in Uganda and concluded they needed fake records.  CC-4 indicated that he assumed the documentation was needed for a U.S. government contract because that was the typical ACI client.  CC-4 decided to help ACI because he wanted to be a "good soldier" and because, years earlier, ACI moved his business in Africa up to the next level.  CC-4 also stated that he never heard of Suruma and did not know that ACI had listed CC-9 (his girlfriend), CC-9's friend, and CC-4's attorney as contacts at Suruma.  CC-4 also indicated that the contacts ACI had listed for Ekekwe were himself and his roofer, but CC-4 stated that he did not agree to be a fake representative for Ekekwe.

//

//

//

//

//

//

//

//

17

## V.   CONCLUSION

50.   For all the reasons described above, there is probable cause to believe that AMIRI violated 18 U.S.C. §§ 1349, 1343 (Conspiracy to Commit Wire Fraud).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st day of
December, 2020.

_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

18