TRACY WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0698
     Facsimile:  (213) 894-6269
     E-mail:    jeff.mitchell@usdoj.gov
DANIEL S. KAHN
Acting Chief, Fraud Section
MATTHEW KAHN
Trial Attorney (Fla. Bar No. 72032)
Criminal Division, Fraud Section
United States Department of Justice
     1400 New York Avenue, NW
     Washington, DC 20005
     Phone: (202) 794-3358
     Email: Matthew.Kahn2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

April 14, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VPC___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR   21-00165-SB |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT SAED ISMAIL AMIRI |
| v. | |
| SAED ISMAIL AMIRI, aka "Adnan Herat," | |
| Defendant. | |

    1.   This constitutes the plea agreement between SAED ISMAIL
AMIRI ("defendant"), the United States Attorney's Office for the
Central District of California (the "USAO"), and the Department of
Justice, Fraud Section (collectively, "the Offices"), in the above-
captioned case.  This agreement is limited to the Offices and cannot

1  bind any other federal, state, local, or foreign prosecuting,

2  enforcement, administrative, or regulatory authorities.

3                    DEFENDANT'S OBLIGATIONS

4      2.   Defendant agrees to:

5          a.   At the earliest opportunity requested by the Offices

6  and provided by the Court, appear and plead guilty to a single-count

7  information in the form attached to this agreement as Exhibit A or a

8  substantially similar form, which charges defendant with Wire Fraud

9  in violation of 18 U.S.C. § 1343.

10         b.   Not contest facts agreed to in this agreement.

11         c.   Abide by all agreements regarding sentencing contained

12  in this agreement.

13         d.   Appear for all court appearances, surrender as ordered

14  for service of sentence, obey all conditions of any bond, and obey

15  any other ongoing court order in this matter.

16         e.   Not commit any crime; however, offenses that would be

17  excluded for sentencing purposes under United States Sentencing

18  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

19  within the scope of this agreement.

20         f.   Be truthful at all times with the United States

21  Probation and Pretrial Services Office and the Court.

22         g.   Pay the applicable special assessment at or before the

23  time of sentencing unless defendant has demonstrated a lack of

24  ability to pay such assessments.

25                    THE OFFICES' OBLIGATIONS

26     3.   The Offices agrees to:

27         a.   Not contest facts agreed to in this agreement.

28

 1          b.    Abide by all agreements regarding sentencing contained

 2    in this agreement.

 3          c.    At the time of sentencing, provided that defendant

 4    demonstrates an acceptance of responsibility for the offense up to

 5    and including the time of sentencing, recommend a two-level reduction

 6    in the applicable Sentencing Guidelines offense level, pursuant to

 7    U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

 8    additional one-level reduction if available under that section.

 9          d.    Except for criminal tax violations (including

10    conspiracy to commit such violations chargeable under 18 U.S.C.

11    § 371), not further criminally prosecute defendant for violations of

12    18 U.S.C. § 1349; 18 U.S.C. § 1031; 18 U.S.C. § 495; 18 U.S.C.

13    § 1028A; and 18 U.S.C. § 1001 (including conspiracy to commit such

14    violations chargeable under 18 U.S.C. § 371) arising out of

15    defendant's conduct described in the agreed-to factual basis set

16    forth in in Exhibit B.  Defendant understands that the Offices are

17    free to criminally prosecute defendant for any other unlawful past

18    conduct or any unlawful conduct that occurs after the date of this

19    agreement.  Defendant agrees that at the time of sentencing the Court

20    may consider the uncharged conduct in determining the applicable

21    Sentencing Guidelines range, the propriety and extent of any

22    departure from that range, and the sentence to be imposed after

23    consideration of the Sentencing Guidelines and all other relevant

24    factors under 18 U.S.C. § 3553(a).

25                        NATURE OF THE OFFENSE

26         4.   Defendant understands that for defendant to be guilty of

27    the crime charged in the single-count information, that is, Wire

28

                                    3

Fraud, in violation of Title 18, United States Code, Sections 1343, the following must be true:

        a.   The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts;

        b.   The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

        c.   The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

        d.   The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

<u>PENALTIES</u>

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Sections 1343, is: 20 years imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the

offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

8.    Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

9.    Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offense to which

defendant is pleading guilty. However, the parties agree that no restitution is owed under the circumstances of this case. Defendant understands that the Court may reach a different conclusion.

### FACTUAL BASIS

10. Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty. Defendant and the Offices agree to the statement of facts provided in Exhibit B and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

### SENTENCING FACTORS

11. Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

12. Defendant and the Offices agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level: | [7] | [U.S.S.G. § 2B1.1(a)(1)] |
| Substantial part of Offense Committed from Outside United States: | [5] | [U.S.S.G. § 2B1.1(b)(10)] |
| Leadership Role: | [4] | [U.S.S.G. § 3B1.1(a)] |
| Acceptance of Responsibility: | [-3] | [U.S.S.G. § 3E1.1] |
| Total Offense Level: | [13] | |

The Offices will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 3(c) are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraph 27 below, defendant and the Offices agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed.  Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the Offices were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the Offices, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the Offices would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

        13.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

14.   Defendant and the United States reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7), specifically the defendant reserves the right to argue for – and the government reserves the right to contest – a potential two-level variance as recognition of defendant's early acceptance of responsibility, which, because the justice system is facing an unprecedented crisis through the backlog of cases, will lessen the burden on the court system during this unprecedented crisis by: (1) waiving any right to presence and pleading guilty at the earliest opportunity by VTC (or telephone, if VTC is not reasonably available); (2) waiving any right to presence and agreeing to be sentenced by VTC (or telephone, if VTC is not reasonably available) should the Central District of California's General Order allow for it; (3) agreeing to appear at all other times by VTC or telephone; and (4) waiving all appellate rights.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

15.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.    The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

8

     d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

     e.   The right to confront and cross-examine witnesses against defendant.

     f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

     g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

     h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF STATUTE OF LIMITATIONS</u>

16.  Having been fully advised by defendant's attorney regarding application of the statute of limitations to the offense to which defendant is pleading guilty, defendant hereby knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have not to be prosecuted for the offense to which defendant is pleading guilty because of the expiration of the statute of limitations for that offense prior to the filing of the information alleging that offense; and (b) any defense, claim, or argument defendant could raise or assert that prosecution of the offense to which defendant is pleading guilty is barred by the expiration of the applicable statute of limitations, pre-indictment delay, or any speedy trial violation.

1

## WAIVER OF APPEAL OF CONVICTION

2      17.   Defendant understands that, with the exception of an appeal

3 based on a claim that defendant's guilty plea was involuntary, by

4 pleading guilty defendant is waiving and giving up any right to

5 appeal defendant's conviction on the offense to which defendant is

6 pleading guilty.  Defendant understands that this waiver includes,

7 but is not limited to, arguments that the statute to which defendant

8 is pleading guilty is unconstitutional, and any and all claims that

9 the statement of facts provided herein is insufficient to support

10 defendant's plea of guilty.

11

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

12      18.   Defendant agrees that, provided the Court imposes a term of

13 imprisonment within or below the range corresponding to an offense

14 level of 13 and the criminal history category calculated by the

15 Court, defendant gives up the right to appeal all of the following:

16 (a) the procedures and calculations used to determine and impose any

17 portion of the sentence, with the exception of the Court's

18 calculation of defendant's criminal history category; (b) the term of

19 imprisonment imposed by the Court, except to the extent it depends on

20 the Court's calculation of defendant's criminal history category; (c)

21 the fine imposed by the Court, provided it is within the statutory

22 maximum; (d) to the extent permitted by law, the constitutionality or

23 legality of defendant's sentence, provided it is within the statutory

24 maximum; (e) the term of probation or supervised release imposed by

25 the Court, provided it is within the statutory maximum; and (g) any

26 of the following conditions of probation or supervised release

27 imposed by the Court: the conditions set forth in Amended General

28 Order 20-04 of this Court; the drug testing conditions mandated by 18

U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

19. Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, that newly discovered evidence purportedly supports defendant's innocence, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

20. The Offices agree that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 13 and the criminal history category calculated by the Court, the Offices gives up the right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

21. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the Offices will be relieved of all of their obligations under this agreement; and (b) should the Offices choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of

1  limitations will be tolled between the date of defendant's signing of

2  this agreement and the filing commencing any such action; and

3  (ii) defendant waives and gives up all defenses based on the statute

4  of limitations, any claim of pre-indictment delay, or any speedy

5  trial claim with respect to any such action, except to the extent

6  that such defenses existed as of the date of defendant's signing this

7  agreement.

8  <u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

9        22.  Defendant agrees that if the count of conviction is

10  vacated, reversed, or set aside, both the Offices and defendant will

11  be released from all their obligations under this agreement.

12  <u>EFFECTIVE DATE OF AGREEMENT</u>

13       23.  This agreement is effective upon signature and execution of

14  all required certifications by defendant, defendant's counsel, and an

15  Assistant United States Attorney.

16  <u>BREACH OF AGREEMENT</u>

17       24.  Defendant agrees that if defendant, at any time after the

18  effective date of this agreement, knowingly violates or fails to

19  perform any of defendant's obligations under this agreement ("a

20  breach"), the Offices may declare this agreement breached.  All of

21  defendant's obligations are material, a single breach of this

22  agreement is sufficient for the Offices to declare a breach, and

23  defendant shall not be deemed to have cured a breach without the

24  express agreement of the Offices in writing.  If the Offices declare

25  this agreement breached, and the Court finds such a breach to have

26  occurred, then: (a) if defendant has previously entered a guilty plea

27  pursuant to this agreement, defendant will not be able to withdraw

28

the guilty plea, and (b) the Offices will be relieved of all their obligations under this agreement.

25. Following the Court's finding of a knowing breach of this agreement by defendant, should the Offices choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
OFFICE NOT PARTIES

26.  Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the Offices' sentencing recommendations or the parties' agreements to facts or sentencing factors.

27.  Defendant understands that both defendant and the Offices are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.  While this paragraph permits both the Offices and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the Offices' obligations not to contest the facts agreed to in this agreement.

28.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to

fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

29.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the Offices and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

1        PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        30.   The parties agree that this agreement will be considered

3   part of the record of defendant's guilty plea hearing as if the

4   entire agreement had been read into the record of the proceeding.

5

6   AGREED AND ACCEPTED

7   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
8   CALIFORNIA

9   TRACY L. WILKISON
    Acting United States Attorney

10

11   _____          April 2, 2021
                                               Date
12   JEFF MITCHELL
     Assistant United States Attorney

13

14   _____          April 2, 2021
     MATTHEW KAHN                              Date
15   Trial Attorney, Fraud Section

                                               March 24, 2021
16   _____          Date
     SAED ISMAIL AMIRI
17   Defendant

18   _____          Date
     JEFFREY RUTHERFORD
19   Attorney for Defendant
     Saed Ismail Amiri

20

21   _____          Date
     MICHAEL FARHANG
     Attorney for Defendant
22   Saed Ismail Amiri

23

24

25

26

27

28

                              16

1         <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2      30.   The parties agree that this agreement will be considered

3 part of the record of defendant's guilty plea hearing as if the

4 entire agreement had been read into the record of the proceeding.

5

6 AGREED AND ACCEPTED

7 UNITED STATES ATTORNEY'S OFFICE
  FOR THE CENTRAL DISTRICT OF
8 CALIFORNIA

9 TRACY L. WILKISON
  Acting United States Attorney

10

11 _____    _____

12 JEFF MITCHELL                Date
  Assistant United States Attorney

13

14 _____    _____

  MATTHEW KAHN                Date
15 Trial Attorney, Fraud Section

16 _____    _____

  SAED ISMAIL AMIRI          Date
17 Defendant                         3/24/2021

18 _____    _____

  JEFFREY RUTHERFORD         Date
19 Attorney for Defendant
  Saed Ismail Amiri

20 _____    _____

  MICHAEL FARHANG           Date
21 Attorney for Defendant
  Saed Ismail Amiri

22

23

24

25

26

27

28

1          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2          30.  The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5

6    AGREED AND ACCEPTED

7    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
8    CALIFORNIA

9    TRACY L. WILKISON
     Acting United States Attorney
10

11   _____          _____
     JEFF MITCHELL                         Date
12   Assistant United States Attorney

13

14   _____          _____
     MATTHEW KAHN                          Date
15   Trial Attorney, Fraud Section

16   _____          _____
     SAED ISMAIL AMIRI                     Date
17   Defendant

18   _____          _____
     JEFFREY RUTHERFORD                    Date
19   Attorney for Defendant
     Saed Ismail Amiri
20   _____            March 24, 2021
     _____          _____
21   MICHAEL FARHANG                       Date
     Attorney for Defendant
22   Saed Ismail Amiri

23

24

25

26

27

28
                                  16

1

<u>CERTIFICATION OF DEFENDANT</u>

2    I have read this agreement in its entirety.  This agreement has

3 been read to me in Farsi, the language I understand best.  I have had

4 enough time to review and consider this agreement, and I have

5 carefully and thoroughly discussed every part of it with my attorney.

6 I understand the terms of this agreement, and I voluntarily agree to

7 those terms.  I have discussed the evidence with my attorneys, and my

8 attorneys have advised me of my rights, of possible pretrial motions

9 that might be filed, of possible defenses that might be asserted

10 either prior to or at trial, of the sentencing factors set forth in

11 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions,

12 and of the consequences of entering into this agreement.  No

13 promises, inducements, or representations of any kind have been made

14 to me other than those contained in this agreement.  No one has

15 threatened or forced me in any way to enter into this agreement.  I

16 am satisfied with the representation of my attorneys in this matter,

17 and I am pleading guilty because I am guilty of the charge and wish

18 to take advantage of the promises set forth in this agreement, and

19 not for any other reason.

20

21 _____        _____
   SAED ISMAIL AMIRI                       Date    March 24, 2021
22 Defendant

23

24

25

26

27

28

17

<u>CERTIFICATION OF INTERPRETER</u>

I, Marzieh Hakimi Rad, am fluent in the written and spoken English and Farsi languages. I accurately translated this entire agreement from English into Farsi to defendant SAED ISMAIL AMIRI on this date.

 Hakimi Rad                          24.03.2021
_____     _____
INTERPRETER                             Date

//

//

//

18

1          CERTIFICATION OF DEFENDANT'S ATTORNEY

2          We are Saed Ismail Amiri's attorneys.  We have carefully and

3      thoroughly discussed every part of this agreement with our client.

4      Further, we have fully advised our client of his rights, of possible

5      pretrial motions that might be filed, of possible defenses that might

6      be asserted either prior to or at trial, of the sentencing factors

7      set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8      provisions, and of the consequences of entering into this agreement.

9      To our knowledge: no promises, inducements, or representations of any

10     kind have been made to our client other than those contained in this

11     agreement; no one has threatened or forced our client in any way to

12     enter into this agreement; our client's decision to enter into this

13     agreement is an informed and voluntary one; and the factual basis set

14     forth in Exhibit B is sufficient to support our client's entry of a

15     guilty plea pursuant to this agreement.

16                                                      3|24|2021

17     _____        _____
       JEFFREY RUTHERFORD                       Date
       Attorney for Defendant
18     Saed Ismail Amiri

19

20     _____        _____
       MICHAEL FARHANG                          Date
21     Attorney for Defendant
       Saed Ismail Amiri
22

23

24

25

26

27

28

                                    19

1

CERTIFICATION OF DEFENDANT'S ATTORNEY

2    We are Saed Ismail Amiri's attorneys.  We have carefully and

3 thoroughly discussed every part of this agreement with our client.

4 Further, we have fully advised our client of his rights, of possible

5 pretrial motions that might be filed, of possible defenses that might

6 be asserted either prior to or at trial, of the sentencing factors

7 set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8 provisions, and of the consequences of entering into this agreement.

9 To our knowledge: no promises, inducements, or representations of any

10 kind have been made to our client other than those contained in this

11 agreement; no one has threatened or forced our client in any way to

12 enter into this agreement; our client's decision to enter into this

13 agreement is an informed and voluntary one; and the factual basis set

14 forth in Exhibit B is sufficient to support our client's entry of a

15 guilty plea pursuant to this agreement.

16

17 _____          _____
JEFFREY RUTHERFORD                                Date
18 Attorney for Defendant
Saed Ismail Amiri

19                                                  3/24/2021
20 _____          _____
MICHAEL FARHANG                                   Date
21 Attorney for Defendant
Saed Ismail Amiri

22

23

24

25

26

27

28

19

# EXHIBIT A

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          CR No.

11           Plaintiff,                I N F O R M A T I O N

12           v.                        [18 U.S.C. § 1343: Wire Fraud]

13  SAED ISMAIL AMIRI,
       aka "Adnan Herat,"

14
             Defendant.

15

16       The Acting United States Attorney charges:

17                      [18 U.S.C. § 1343]

18  A.   INTRODUCTORY ALLEGATIONS

19       At times relevant to the Information:

20       1.   Defendant SAED ISMAIL AMIRI, also known as "Adnan Herat,"

21  was the owner or senior consultant of Assist Consultants Incorporated

22  ("ACI"), an Afghan company that had received U.S. funded contracts

23  since 2013.  Defendant AMIRI was the primary decisionmaker on behalf

24  of ACI.

25       2.   In connection with the United States' effort to reconstruct

26  and assist Afghanistan and its people, the United States Agency for

27  International Development ("USAID") provided the national power

28  utility of Afghanistan, Da' Afghanistan Breshna Sherkat ("DABS"),

with financial assistance to expand Afghanistan's electric grid. USAID was a U.S. government agency funded by U.S. tax dollars and headquartered in Washington, D.C.

3.    In or around January 2015, USAID authorized DABS to solicit bids on a U.S. funded contract to design and construct five electric power substations to connect Afghanistan's Northeastern and Southeastern electric grid systems (the project to be constructed is hereinafter referred to as "NEPS/SEPS").  In or around February 2015, DABS issued a Letter of Invitation ("LOI") in which it stated that it had received USAID funding to build the electric power substations, and solicited competitive bids on the contract.  The LOI sought bids only from companies that had substantial prior experience building electric power substations. Specifically, the LOI criteria required bidders, such as ACI, to have previously worked on two electric substations of 220 kilovolts or more.

B.    THE SCHEME TO DEFRAUD

4.    Beginning on an unknown date, and continuing through at least on or about April 8, 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant AMIRI, knowingly and with the intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud DABS as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts.

C.    THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

5.    The scheme to defraud operated in substance in the following manner:

a. In 2015 and 2016, defendant AMIRI, ACI employees, and others sought to obtain the NEPS/SEPS contract by submitting a false work history and false supporting documents in an effort to trick and deceive DABS into believing that ACI met the criterion of having previously worked on two 220 kilovolt substations.

b. Defendant AMIRI and ACI employees created fake companies and false supporting documents, including documents bearing false logos, such as false certificates of completion; misrepresented the contents of photographs; and registered domain names to give the impression that the fake companies and ACI's claimed prior work experience were real.  Defendant AMIRI closely supervised the preparation of several of the false documents related to the fake companies and their purported but in fact non-existent contracts with ACI.

c. With defendant AMIRI's knowledge, ACI submitted a bid of approximately $112,292,241 to DABS for the NEPS/SEPS electric power substation contract.  ACI underbid its competitors by more than $20 million.  The bid falsely stated that ACI had worked as a subcontractor for Electra Professional Solutions ("EPS"), a fictitious company ACI controlled, and had built electric power substations for the Suruma Cement Factory in Uganda and the Ekekwe Textile Company in Nigeria.  These statements were false.  In truth, ACI had never constructed or assisted in the construction of an electric power substation as a prime contractor or subcontractor in Africa at the time ACI stated and represented as part of its bid for the NEPS/SEPS contract that it had.

d. In or around December 2015, DABS observed indicators of fraud in ACI's bid for the NEPS/SEPS contract related to the voltage

capacity in the Ugandan project described in the work history that ACI included in its bid.  DABS thereafter began seeking corroboration of ACI's work experience with electric power substations in Uganda and Nigeria. DABS contacted EPS at the address that ACI had listed in its bid, which address ACI then controlled.

e. DABS also contacted ACI and requested that ACI provide contact information and supporting documents to further verify the work history set forth in the bid, including a letter from the Ugandan national power utility to validate the work on the Suruma project in Uganda that ACI had claimed it had performed.

f. Defendant AMIRI directed his co-schemers to obtain false documents from Uganda and Nigeria to provide to DABS.

g. Defendant AMIRI emailed DABS a series of documents he then knew to be false and altered, consisting of: ACI's purported subcontract to work on the Ugandan substation; coordinates of the substation; photographs of the substation; false bank records; and a letter that purported to be from a Ugandan government official.  At the time they were submitted by ACI to DABS, these documents were material to DABS' decision whether to award the electric power substation contract to ACI in connection with the bid ACI submitted.

D.   <u>THE USE OF THE WIRES</u>

6.   On or about February 29, 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant AMIRI caused the transmission by means of wire communication in interstate and foreign commerce of an email from the Central District

//

4

1    of California to co-schemers who were outside the State of

2    California, advising his co-schemers that, "We need to send [an ACI

3    employee] to both Niger and Uganda."

4

5

6                                   TRACY WILKISON
                                    Acting United States Attorney
7

8

9                                   BRANDON D. FOX
                                    Assistant United States Attorney
10                                  Chief, Criminal Division

11                                  RANEE A. KATZENSTEIN
                                    Assistant United States Attorney
12                                  Chief, Major Frauds Section

13                                  MONICA TAIT
                                    Assistant United States Attorney
14                                  Deputy Chief, Major Frauds Section

15                                  JEFF MITCHELL
                                    Assistant United States Attorneys
16                                  Major Frauds Section

17                                  DANIEL KAHN
                                    Acting Chief, Fraud Section
18                                  Criminal Division

19                                  MATT KAHN
                                    Trial Attorney, Fraud Section
20                                  Criminal Division

21

22

23

24

25

26

27

28

                                    5

EXHIBIT B

**EXHIBIT B TO PLEA AGREEMENT OF**

**SAED ISMAIL AMIRI**

**<u>STATEMENT OF FACTS SUPPORTING PLEA AGREEMENT</u>**

1.   At all relevant times, SAED ISMAIL AMIRI, also known as "Adnan Herat," was the owner or senior consultant of Assist Consultants Incorporated ("ACI"), an Afghan company that had received U.S. funded contracts since 2013. AMIRI was the primary decisionmaker on behalf of ACI.

2.   In connection with the United States' effort to reconstruct and assist Afghanistan and its people, the United States Agency for International Development ("USAID") has provided the national power utility of Afghanistan, Da' Afghanistan Breshna Sherkat ("DABS"), with financial assistance to expand Afghanistan's electric grid. USAID is a U.S. government agency funded by U.S. tax dollars and headquartered in Washington, D.C. USAID leads international development and humanitarian efforts to save lives, reduce poverty, strengthen democratic governance, and help people progress beyond assistance.

3.   In or around January 2015, USAID authorized DABS to solicit bids on a U.S. funded contract to design and construct five electric power substations to connect Afghanistan's Northeastern and Southeastern electric grid systems (the project to be constructed is hereinafter referred to as "NEPS/SEPS"). In or

around February 2015, DABS issued a Letter of Invitation ("LOI") in which it stated that it had received USAID funding to build the electric power substations, and solicited competitive bids on the contract. The LOI sought bids only from companies that had substantial prior experience building electric power substations. Specifically, the LOI criteria required bidders, such as ACI, to have previously worked on two electric substations of 220 kilovolts or more.

4.   In 2015 and 2016, AMIRI, ACI employees, and others (referred to herein as co-schemers 1-7) engaged in a scheme to obtain the NEPS/SEPS contract by submitting a false work history and false supporting documents in an effort to trick and deceive DABS into believing that ACI met the criteria of having previously worked on two 220 kilovolt substations.

5.   To further the scheme, on February 22, 2015, co-schemer 1 ("CS-1") emailed AMIRI and advised that he had "[p]repared the checklist for DABS (USAID-funded) NEPS/SEPS substation project."

6.   On March 31, 2015, a consultant advised AMIRI that USAID might not accept ACI's bid on the NEPS/SEPS contract if ACI entered into a joint venture with a lead Chinese partner.

7.   On or about April 14, 2015, CS-1 emailed AMIRI and stated that he was, "[r]eviewing the requirements of NEPS/SEPS substation proposal. Working on preparing proposal structure and preparing some proposal forms."  The next day, CS-1 emailed

AMIRI and indicated he was preparing "experience forms" for the NEPS/SEPS proposal.

8.   On or about May 2, 2015, co-schemer 2 ("CS-2") sent an email to CS-1, which he copied to AMIRI and which stated, "I will start preparing things which have been mentioned," including a "Stamp for Electra" and "Preparation of Certificates."  The next day, CS-2 sent CS-1 an email stating, "Stamps will be ready tomorrow."  CS-2 attached to the email a certificate of appreciation that was backdated to 2011, which was prepared for the "Design, Supply, Erection, Construction, Testing and Commissioning of 220/22 kV Suruma Cement Factory Substation at Kampala Industrial Site, Uganda."  The backdated certificate of appreciation that was subsequently submitted with ACI's bid contained a logo for Electra Professional Solutions ("EPS"), which was a fictitious company that ACI invented and controlled.

9.   On or about July 26, 2015, ACI submitted a bid of $112,292,241.05 for the NEPS/SEPS electric power substation contract.  At the time of the bid, AMIRI knew that USAID had funded the contract.  ACI underbid its competitors by more than $20 million.  The bid stated that ACI had worked as a subcontractor for EPS and had built electric power substations for the Suruma Cement Factory in Uganda and the Ekekwe Textile Company in Nigeria.  These statements were false.  In truth, ACI

3

had never constructed or assisted in the construction of an
electric power substation as a prime contractor or subcontractor
in Africa at the time ACI stated and represented as part of its
bid for the NEPS/SEPS contract that it had.

10.  In or around December 2015, DABS observed indicators of
fraud in ACI's bid for the NEPS/SEPS contract related to the
voltage capacity in the Ugandan project described in the work
history that ACI included in its bid.  DABS thereafter began
seeking corroboration of ACI's stated work experience with
electric power substations in Uganda and Nigeria. DABS contacted
EPS at the address that ACI had listed for it in its bid, which
ACI controlled at all relevant times. In this communication,
DABS asked EPS to confirm whether ACI had in fact worked on the
Ugandan and Nigerian electric power substations.  A few days
later, CS-1, communicated with AMIRI and asked, "[w]hen should
we reply to DABS emails regarding EPS."  AMIRI replied, "Wait."
One week later, ACI sent DABS a letter that purported to be from
EPS and falsely stated that ACI had completed the Ugandan and
Nigerian projects.

11.  On or about February 5, 2016, DABS requested that EPS
provide addresses for representatives at the Suruma Cement
Factory and Ekekwe Textile Company in connection with DABS'
efforts to further verify the work history that ACI had included
in its bid.  CS-1 sent the communication to AMIRI, and noted

that they also needed an address, phone number, and a person to answer calls that DABS would make to verify the information. AMIRI replied to CS-1's email by asking, "Is there any cement factory in Uganda?," "Is there any company in the world by the name of Suruma Cement Factory?," and "How long it will take to open a company in Uganda?" AMIRI also stated, "[B]uy a dom[a]in for Suruma Cement factory as soon as possible?," and "How long can we activ[ate] this website, we will need two team to work on it?" CS-1 responded by stating that Suruma and Ekekwe did not exist, to which AMIRI replied, "Ok, we will start registration soon but we need to start the websites right[] away[.]"

12.  On or about February 14, 2016, ACI employees, purporting to be employees of EPS, sent DABS the addresses for purported contacts at the Suruma Cement Factory and Ekekwe Textile Company. These purported points of contact included co-schemer 3 ("CS-3"), a business affiliate of ACI residing in Uganda. AMIRI expected his co-schemers to conceal the fraud in the event that DABS sought to verify ACI's claimed experience with electric power substations in Uganda and Nigeria.

13.  On or about February 18, 2016, AMIRI returned to his residence in the Los Angeles area. While AMIRI was in the Central District of California, DABS contacted ACI and requested that ACI provide contact information and supporting documents to further verify ACI's work history, including a letter from the

Ugandan national power utility to validate the ACI's asserted work on the Suruma Cement Project in Uganda.

14.   While AMIRI was still in the Central District of California, AMIRI sent emails to co-schemers outside of the State of California, including a series of emails on or about February 29, in which AMIRI advised his co-schemers that some of them would need to go to Uganda and Nigeria to obtain false documents to respond to DABS' inquiries. These emails caused wire communications in interstate and foreign commerce, in furtherance of the scheme, specifically:

> On or about February 29, 2016, in Los Angeles County, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant AMIRI caused the transmission by means of wire communication in interstate and foreign commerce of an email from the Central District of California to co-schemers outside the State of California, advising them that, "We need to send [an ACI employee] to both Niger and Uganda."

15.   On or about March 15, 2016, co-schemer 6 ("CS-6"), a bank-teller in Uganda, emailed co-schemer 4 ("CS-4") a draft of a bank statement purportedly indicating that EPS had paid ACI for working on the electric power substation for the Suruma Cement Factory. CS-4 then sent the false bank document to AMIRI and

stated, "The bank letter looks very real and professional but at a price." As AMIRI then knew, the bank statement was false.

16. On or about March 16, 2016, AMIRI emailed DABS a series of documents he knew were false and altered, consisting of: ACI's purported subcontract to work on the Ugandan substation; coordinates of the substation; photographs of the substation; false bank records; and a false letter purporting to be from a Ugandan government official. These documents were material to DABS' decision whether to award the electric power substation contract to ACI.

17. On or about March 20, 2016, CS-5 emailed AMIRI and stated that USAID had called co-schemer 7 ("CS-7"), a Ugandan citizen who was one of the fake company representatives whose contact information ACI had previously provided to DABS. CS-5 stated that he reached out to the fake representatives to ensure that they knew "to validate." AMIRI replied, "if he was real USAID, he would send email for sure, so let's wait more to see[.]" CS-5 responded: "Ok, let's wait a day or two before we do anything, obviously this was started by our submission package. I believe we have or [sic] bases covered here so let's just wait it out. We have the phone number that made the call so Ismail [AMIRI] when you are in Kabul you could call it to see who answers. Tomorrow I meet with the embassy here again and am supposed to have the electronic copy of the past performance, we will see

what we get and then develop a way forward plan. Depending on what we get and the contacts we will determine how to proceed." AMIRI replied, "Roger that."

18.  In March and April 2016, CS-5, while in Uganda and Nigeria, sought to obtain false documents to further the scheme. Specifically, on April 3, 2016, CS-5 advised AMIRI and the other co-schemers that he was in Nigeria and stated: "we are speaking with an ex member of parliament and an official at the Lagos power authority to get the required documentation. I believe we are able to complete the task with minimal drama.  My only real concern is cost right now, we have kept the conversation very casual and explained that we are developing past performance as a pre-requisite for future work and that the submission package will be authenticated by a donor nation. All in all I don't foresee difficulties as long a greed [sic] doesn't get stupid."

19.  On April 20, 2016, AMIRI met with U.S. law enforcement at the U.S. Embassy in Afghanistan, and advised that an ACI employee requested $900,000 from AMIRI's father to bribe DABS to obtain the NEPS/SEPS contract. AMIRI further stated that he learned the prior month, in March 2016, that ACI had bid on the DABS project. Not only were the statements not true, as AMIRI then knew, but AMIRI failed to mention that he was involved in the criminal scheme described above.

20.  On May 3, 2016, AMIRI withdrew ACI's bid.

21.  In a subsequent interview on October 21, 2019, AMIRI stated
that the ACI employee who allegedly attempted to bribe a DABS
official was also responsible for submitting the false documents
to DABS for the NEPS/SEPS contract.  Not only were these
statements not true, as AMIRI then knew, but AMIRI again failed
to mention that he was involved in the criminal scheme described
above.

22.  During the scheme, AMIRI directed and closely supervised
ACI employees and co-schemers in the creation of many of the
false documents and supporting materials, such as certificates,
logos, and photographs, as well as in the registration of domain
names, to give the impression that EPS, Suruma Cement Factory,
the Ekekwe Textile Company and ACI's claimed prior work
experience were real.

23.  AMIRI was the leader of the scheme, which involved more
than five co-schemers and a substantial portion of which was
committed from outside the United States.

24. AMIRI's above-described actions were done knowingly,
willfully, and with the intent to defraud.

*     *     *

<u>CERTIFICATION OF DEFENDANT</u>

This STATEMENT OF FACTS IN SUPPORT OF PLEA AGREEMENT ("statement of facts") has been read to me in its entirety in Farsi, the language I understand best.  I have had enough time to review and consider this statement of facts, and I have carefully and thoroughly discussed every part of it with my attorneys.  I agree that this statement of facts is accurate and correct, and is sufficient to support a plea of guilty to the charge described in the plea agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 of the plea agreement.

_____        _____
SAED ISMAIL AMIRI                      Date   March 24, 2021
Defendant

<u>CERTIFICATION OF INTERPRETER</u>

I, _____, am fluent in the written and spoken English and Farsi languages.  I accurately translated this STATEMENT OF FACTS from English into Farsi to defendant SAED ISMAIL AMIRI on this date.

_____        _____
INTERPRETER                            Date

<u>CERTIFICATION OF DEFENDANT'S ATTORNEYS</u>

We are SAED ISMAIL AMIRI'S attorneys.  We have carefully and thoroughly discussed every part of this statement of facts

10

CERTIFICATION OF DEFENDANT

    This STATEMENT OF FACTS IN SUPPORT OF PLEA AGREEMENT ("statement of facts") has been read to me in its entirety in Farsi, the language I understand best.  I have had enough time to review and consider this statement of facts, and I have carefully and thoroughly discussed every part of it with my attorneys.  I agree that this statement of facts is accurate and correct, and is sufficient to support a plea of guilty to the charge described in the plea agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 of the plea agreement.

_____     _____
SAED ISMAIL AMIRI                  Date
Defendant


CERTIFICATION OF INTERPRETER

    I, Marzieh Hakimi Rad, am fluent in the written and spoken English and Farsi languages.  I accurately translated this STATEMENT OF FACTS from English into Farsi to defendant SAED ISMAIL AMIRI on this date.

 Hakimi Rad
_____     24.03.2021
INTERPRETER                    Date


CERTIFICATION OF DEFENDANT'S ATTORNEYS

    We are SAED ISMAIL AMIRI'S attorneys.  We have carefully and thoroughly discussed every part of this statement of facts

10

with our client and agree that it is sufficient to support a plea of guilty to the charge described in the plea agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 of the plea agreement.

_____
JEFFREY RUTHERFORD
Attorney for Defendant
Saed Ismail Amiri

3/24/2021
_____
Date

_____
MICHAEL FARHANG
Attorney for Defendant
Saed Ismail Amiri

_____
Date

11

with our client and agree that it is sufficient to support a
plea of guilty to the charge described in the plea agreement and
to establish the Sentencing Guidelines factors set forth in
paragraph 12 of the plea agreement.


| | |
|---|---|
| JEFFREY RUTHERFORD | Date |
| Attorney for Defendant | |
| Saed Ismail Amiri | |

| | |
|---|---|
| MICHAEL FARHANG | March 24, 2021 |
| Attorney for Defendant | Date |
| Saed Ismail Amiri | |

11