TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:     (213) 393-5765
     E-mail:       Jeff.Mitchell@usdoj.gov

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
MATT KAHN
Trial Attorney (Fla. Bar No. 72032)
Criminal Division, Fraud Section
United States Department of Justice
     1400 New York Avenue, NW
     Washington, DC 20005
     Phone: (202) 794-3358
     Email: Matthew.Kahn2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>SAED ISMAIL AMIRI,<br><br>        Defendant. | CR No. 21-00165-SB<br><br>GOVERNMENT'S SENTENCING POSITION<br><br>SENTENCING DATE: 9/14/21<br>SENTENCING TIME: 8:00 a.m. |

       Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, Assistant United States Attorney Jeff Mitchell, and Department of Justice Trial Attorney Matt Kahn, hereby files its sentencing position.

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the additional files and records in this case, and such further evidence and argument as the Court permits.

Dated: August 31, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
JEFF MITCHELL
Assistant United States Attorney

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
MATT KAHN
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to his plea agreement, defendant Saed Ismail Amiri ("defendant") pleaded guilty on April 27, 2021 to one count of wire fraud in violation of 18 U.S.C. § 1343. CR 37.

The United States Probation Office ("USPO") disclosed its Presentence Investigation Report ("PSR") on July 6, 2021. CR 43. As detailed therein, the USPO determined that the total offense level under the United States Sentencing Guidelines ("USSG") applicable to defendant's conviction is 13; that defendant's criminal history score of 0 establishes a USSG Criminal History Category of I; that the applicable USSG range of imprisonment is therefore 12–18 months; that the Guidelines term of supervised release is 1–3 years; that the fine range is between $5,500 and $55,000; and that a mandatory $100 special assessment is due. The government does not object to these calculations.[1]

For the reasons set forth below, pursuant to the parties' plea agreement, and consistent with the factors set forth in 18 U.S.C. § 3553(a)(1)–(2), the government recommends that the Court impose: a term of imprisonment of 15 months; a $55,000 fine; and a mandatory $100 special assessment.

**STATEMENT OF FACTS**

Defendant was at various times either the owner or senior consultant of Assist Consultants Incorporated ("ACI"), an Afghan company that has received over a quarter-billion in U.S. funded contracts since 2013. PSR ¶ 9. In January 2015, USAID, authorized the national power utility of Afghanistan, Da' Afghanistan Breshna Sherkat ("DABS"), to solicit bids on a U.S. funded contract to construct five electric power substations to connect Afghanistan's Northeastern and Southeastern electric grid systems. *Id.* ¶ 11. Bids were sought only from companies with substantial experience building electric substations. *Id.* ¶ 12. Contract criteria required bidders to have worked on two electric substations of 220 kilovolts or more. *Id.*

---

[1] The USPO also disclosed its Sentencing Recommendation on July 6, 2021, wherein it recommended a variance and that defendant be sentenced to a one-year term of probation and ordered to pay a $55,000 fine. CR 42. The USPO further noted that defendant was entitled to argue for a two-level variance, which would bring the offense level to 11 with a criminal history category of I, making the applicable guideline range in Zone B, under which the Court may impose probation. *Id.* The government respectfully submits that probation's recommended sentence is the definition of a slap on the wrist. The reality is that even a statutory maximum fine of $250,000 would not appear to meaningfully affect someone with millions of dollars and multiple properties in the U.S. and abroad—including three properties in Dubai. PSR ¶¶ 107-127. As such, the only thing that will further the goals of sentencing, which will be discussed below, is some form of custodial sentence.

In 2015 and 2016, defendant, ACI employees, and others engaged in a scheme to obtain the contract by submitting a false work history and fraudulent supporting documents in an effort to deceive DABS into believing ACI met the required contract criteria. PSR ¶ 13. More specifically, in July 2015, when defendant knew USAID was funding the contract, ACI submitted a bid for $112,292,241.05, which underbid its competitors by more than $20 million. *Id.* ¶ 20. In the bid, ACI stated it had worked as a subcontractor to a prime contractor on two 220 kilovolt substations for a cement factory in Uganda and a textile company in Nigeria. *Id.* In fact, ACI never worked on building a 220 kilovolt substation in Africa, the alleged prime contractor was a fictitious company that ACI had invented and controlled, and neither the Ugandan nor the Nigerian company existed. *Id.* ¶ 20-22.

In February 2016, defendant returned to his residence in the Los Angeles area, at which time DABS had contacted ACI and requested supporting documents to verify ACI's work history. PSR ¶ 22-24. Defendant then sent emails to co-conspirators outside California, including emails in which he advised that some of them would need to go to Africa to obtain false documents. *Id.* ¶ 39.

Defendant thereafter departed the United States and, in furtherance of the scheme, emailed DABS documents he knew were false, including ACI's purported subcontract to work on the Ugandan substation; coordinates of the substation; photographs of the substation; forged African bank records; and a false letter purporting to be from a Ugandan government official. PSR ¶ 25-30.

After submitting the fake records to DABS, defendant met with law enforcement agents at the U.S. Embassy in Afghanistan. PSR ¶ 33. During that meeting, defendant falsely stated that he had learned the prior month that ACI had bid on the contract. *Id.* Shortly thereafter, defendant withdrew ACI's bid. *Id.* ¶ 34. In a subsequent interview with law enforcement, he falsely stated another ACI employee submitted the false documents to DABS, when in truth and in fact, he emailed the false documents himself. *Id.* ¶¶ 25, 35.

Defendant was charged by a one-count information on April 5, 2021, to which he pleaded guilty pursuant to the parties' plea agreement, on April 27, 2021. CR 28, 33, 37.

## THE PRESENTENCE REPORT

The USPO calculated defendant's Total Guidelines Offense Level as 13, a calculation with which the government agrees:

2

| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
|---|---|---|
| Scheme Committed Abroad | +5 | U.S.S.G. § 2B1.1(b)(10)(B) |
| Role in the Offense | +4 | U.S.S.G. § 3B1.1(a) |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a)-(b) |

*See* PSR ¶¶ 44–60.

The USPO calculated defendant's Criminal History Score as 0, placing him within Criminal History Category I, a calculation with which the government also agrees. PSR ¶¶ 61–68. The USPO also found that the Guidelines range for defendant's term of imprisonment was 12–18 months; that the maximum statutory term of imprisonment was 20 years; that the Guidelines term of Supervised Release is 1–3 years; that the fine range is between $5,500 and $55,000; and that a mandatory $100 special assessment is due. *Id.* ¶¶ 137–148. The government agrees with these calculations.

## THE GOVERNMENT'S SENTENCING POSITION

The government recommends that defendant be sentenced to a mid-range Guidelines term of imprisonment of 15 months, and that he be ordered to pay a $55,000 fine and $100 special assessment. Although the USPO recommended that he receive a two-level variance as recognition of his *early* acceptance of responsibility, the government disagrees based on other facts that the USPO recognized:

> [Defendant's] conduct continued from January 2015, through April 2016, demonstrating that his conduct was not easily discoverable by law enforcement. [He] engaged in numerous actions to not only continue the fraudulent activity, but to conceal his conduct from law enforcement. Moreover, based on his interviews with law enforcement, he was not forthcoming when he was initially questioned about his involvement in the fraudulent scheme.

PSR Recommendation Letter at 7. In fact, defendant lied to agents as late as October 2019—more than four-and-a-half years after the scheme began. Had he accepted responsibility when he first approached law enforcement in April 2016, he would not be eligible for a variance. Accordingly, defendant should neither benefit from a delay in justice that he himself prolonged through his repeated deceptions, nor should he benefit from his initial unwillingness to accept responsibility, which lingered for years.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a). Such factors support a sentence at the middle of the Guidelines range, which is critical to reflect the seriousness of the offense, promote respect for the law, provide for just punishment, deter others, and protect the public.

**1)  History and Characteristics of Defendant**

While defendant does not have any known criminal history, prior to committing the crime, he was a wealthy businessman with an engineering degree, who worked for the U.S. Army Corp of Engineers ("USACE"). PSR ¶ 73, 88, 103. His company, ACI, has received over a quarter-billion in U.S. contracts since 2013. PSR ¶ 9. Not only was he wealthy, educated, and experienced with the U.S. Government at the time that he committed the offense, he had also worked as a Senior Advisor for the Ministry of Energy and Water in the Afghan Government. PSR ¶ 116.[2]

The Court should consider defendant's wealth, status, and power when he committed the crime. He cheated not out of desperation, but rather greed, so much so that when ACI was asked about the bid—at which point he could have withdrawn it—instead, he kicked the scheme into high gear by sending his co-schemers around the world on a "mission" to double-down on ACI's false claims.  PSR ¶ 26. *See United States v. Miell*, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010), *aff'd*, 661 F.3d. 995 (8th Cir. 2011) ("A crime of fraud by one who is otherwise successful, apparently by legitimate means, is also particularly disturbing. Thus, in light of [the defendant's] history and characteristics, this is a case of greed for the sake of greed, not greed for the sake of gain."). It is all the more disturbing that such cheating and greed, which was not based on desperation, came at the expense of a desperate nation. Yet this did not matter to defendant, who was moving to the United States where he would enjoy a higher standard of living than millions of Afghans, who still lack electricity to this day. PSR ¶ 70, 89.[3]

---

[2] In 2014, the year before the offense, the U.S. Army wrote an article about defendant's rise in Afghanistan from a USACE engineer. *See* "USACE's enduring legacy to Afghanistan: New Generation of Afghan Engineers," U.S. ARMY (May. 15, 2014), *available at*: https://www.army.mil/article/126021/usaces_enduring_legacy_to_afghanistan_new_generation_of_af ghan_engineers. In the article, Defendant stated that at USACE he learned to manage a team with "pride of purpose and integrity" and he would "never forget the help and sacrifices that the U.S. and international community provided to Afghanistan." *Id.* Yet by 2015—only one year after the article— he ignored the help that the U.S. had provide him when he directed a team of seven co-schemers who lacked "pride of purpose and integrity" to brazenly defraud USAID and DABS.

[3] "Recent estimates indicate only 30 percent of Afghans have access to electricity." https://www.usaid.gov/afghanistan/fact-sheets/power-transmission-expansion-and-connectivity-ptec-

4

On top of his greed, defendant obstructed law enforcement with one deception after another. *See United States v. Lafuente*, 760 F. App'x 782, 786–87 (11th Cir. 2019) ("The court put great significance on the fact that Lafuente defrauded a government agency meant to assist veterans, the length of time Lafuente's crime went on, the amount of money it involved, *the fact that Lafuente lied to government agents* . . . .")(emphasis added)). First, he travelled from the United States to Afghanistan, where he met agents at the U.S. Embassy while ACI's bid was pending and audaciously concealed his role in the offense. PSR ¶¶ 25, 33. Years later, he continued to lie to law enforcement, and even took it one step further by blaming a specific employee for the scheme. *Id.* ¶ 35. A just sentence must take into consideration such aggravating facts, which weigh in favor of incarceration.

### 2) **Seriousness of the Offense, Promoting Respect for the Law, and Just Punishment**

It is the rare crime that arises in the context of the decades long struggle to reconstruct Afghanistan. On top of that, the scheme threatened a very important priority of reconstruction, namely, the electrification of a country with infrastructure that has been devastated by years of war.  Clearly, defendant's conduct is serious and his pattern of lying demonstrates disrespect for the law.

More specifically, defendant: (1) abused his control of an Afghan company to direct a false bid on a contract valued in excess of $100 million in U.S. taxpayer dollars donated in an effort to stabilize a war-torn nation; (2) falsely asserted that ACI had experience with constructing electric grids; (3) underbid competitors by over $20 million; (4) created fake companies to deceive USAID and DABS; (5) directed individuals to fraudulently represent themselves to be employees of such fake companies; (6) sent ACI employees to Africa to meet public officials; (7) obtained fake bank records, contract records, and a forged letter from a Ugandan official; (8) submitted fake documents with forged signatures and logs; (9) lied to agents; (10) and blamed the scheme on his subordinate employee.

As the USPO explained: "Although the Government cannot be certain as to any administrative costs, defendant undoubtedly caused a burden to the Government[.]" PSR Recommendation Letter at 5. Defendant's conduct obviously burdened the U.S. Government by undermining USAID's objective

---

project (accessed July 20, 2021). Furthermore, a "top priority for USAID and the government of Afghanistan is expanding the national power grid by connecting Afghanistan's northeastern power grid with the southeastern power," after which "DABS will be capable of providing affordable power to about 2 million Afghans who have never had power or who are underserved." *Id*.

"to provide technical assistance to DABS to manage, operate, and maintain the national power system," and "to support the Government of Afghanistan's efforts to make the energy sector more attractive to private investors." *See* https://www.usaid.gov/afghanistan/fact-sheets/power-transmission-expansion-and-connectivity-ptec-project (accessed July 20, 2021).[4]

### 3) Affording Adequate Deterrence and Protecting the Public

"[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). In addition, because "fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014). General deterrence is thus a critical goal in fashioning a proper sentence here.

Would-be fraudsters in the United States, and around the world, need to be on notice of the consequences of engaging in the kind of procurement fraud in which defendant engaged. This will deter contractors from: taking advantage of access to U.S. funds; bidding on projects for which they lack the required experience; potentially endangering the public by subpar performance; and causing delay in the vetting of bids and the completion of projects. *See, e.g.*, *United States v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013) (in sentencing defendant who pleaded guilty to wire fraud, court can consider "life-destroying" effects of conduct, even if not tied to loss).

Significantly, a sentence of probation will not deter fraudsters from committing massive fraud on U.S. funded contracts. Indeed, the integrity of the contracting process is of the highest importance. Due to the nature of the USAID contracting process, which often takes place in devastated areas outside the United States, it is very difficult for law enforcement to uncover these types of schemes. Law enforcement must contend with witnesses located in foreign countries, who oftentimes speak different languages. The documentary evidence showing these corrupt arrangements is also often located in foreign countries and not easily accessible. Given the difficulties in holding those who would seek to undermine the contracting process accountable, this Court should not send the message

---

[4] For a discussion of electricity problems in Afghanistan in March 2016, when Defendant was in the midst of the scheme, *see* https://www.nytimes.com/2016/02/18/world/asia/afghanistan-hardship-taliban-bombings.html (accessed July 20, 2021).

that those who submit false bids to receive the upper hand can essentially do so with impunity. Rather, this Court should send a message that this type of activity will be severely punished when uncovered.

Such deterrence is particularly needed in warzones involving reconstruction, where investigating fraud on U.S. Government programs presents unique challenges. As the U.S. Department of Justice has stated to the U.S. Sentencing Commission concerning fraud in warzones:

> [C]rimes [in Afghanistan and locations of U.S. contingency operations] take advantage of particular vulnerabilities in our financial and audit systems, as we deploy resources in war zones and to support peacekeeping and other nation-building efforts. In addition, these crimes often take advantage of the good will the United States extends to other countries, and of the particular mission of the United States as ambassador of free political systems and champion of human rights globally. These crimes are also more difficult to investigate and prosecute because of their overseas venue.

*USSC Hearing on Amendments at 13*, https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120314/Testimony_DOJ.pdf (accessed Jul. 22, 2021).

Finally, specific deterrence and protecting the public is necessary given the scope of the fraud, which involved a contract exceeding $100 million in U.S. taxpayer funds, and which affected millions of Afghans and the reconstruction effort. *See, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1012–13 (9th Cir. 2010) ("The severity and scope of Treadwell's fraud, taking more than $40 million from investors, justified giving significant weight to specific deterrence and to protection of the public."). Furthermore, the sentence here should reflect that defendant repeatedly engaged in criminal conduct— he did not simply make one bad decision.  Lastly, after serving his sentence, defendant may potentially be deported to another country, in which case he will then be outside of the Court's supervision; it is important that the Court's sentence specifically deter defendant from reoffending, which will in turn continue to protect the public.[5]

---

[5] Defendant is a potentially deportable alien. PSR ¶ 70. While the prospect of deportation in and of itself is not grounds for a departure, defendant's immigration status is part and parcel of his "history and characteristics." The government submits that in light of the full range of Section 3553(a) factors, defendant's immigration status does not justify a non-custodial sentence. The government further notes that his status as a deportable alien may also affect any term of supervised release. Absent that status, he could be sentenced to a term of supervised release of no more than three years, *see* 18 U.S.C. § 3583(b)(2), with a Guideline range of one to three years. PSR ¶ 142-143. Pursuant to U.S.S.G. § 5D1.1(c), a sentencing court "ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." The government cannot predict if or how quickly the

7

## **CONCLUSION**

The offense at hand was not a one-off event solely involving the submission of a false bid, which would have been bad enough; rather, it was a sophisticated, coordinated effort to double-down on false claims in such bid, which sent co-schemers across the globe. Moreover, the scheme was not isolated in time; rather, it was extensive, spanning from July 2015 to April 2016, and even longer if one considers defendant's lies to law enforcement in October 2019. In sum, this was a deliberate, calculated scheme to profit from and undermine the U.S. and Afghan government contracting process. This type of corrupt conduct, which delayed the provision of vital public services, likely undermined the Afghan peoples' faith and support in their government. A Guidelines sentence would reflect the seriousness of such conduct and deter such conduct from occurring in the future. Accordingly, the government requests that the Court find the Total Offense Level to be 13 and submits that a 15-month term of imprisonment, $55,000 fine, and mandatory $100 special assessment would be a sentence sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

Dated:  August 31, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
JEFF MITCHELL
Assistant United States Attorney

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
MATT KAHN
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

U.S. immigration authorities may seek to deport defendant. Accordingly, neither supervised release nor a term of probation is an appropriate sentence in light of the full range of Section 3553(a) factors.